# Third District Court of Appeal

## State of Florida

Opinion filed September 17, 2014.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D13-603
Lower Tribunal No. 11-6226
_____

**CDC Builders, Inc.,**
Appellant,

vs.

**Biltmore-Sevilla Debt Investors, LLC, et al.,**
Appellees.

An Appeal from the Circuit Court for Miami-Dade County, John W. Thornton, Judge.

Siegfried, Rivera, Hyman, et al., and Michael J. Kurzman (Plantation); Shubin & Bass, P.A., and John K. Shubin and Deana D. Falce, for appellant.

Peckar & Abramson, P.C., and Gary M. Stein and K. Stefan Chin, for South Florida Associated General Contractors as amicus curiae, for appellant.

Levine & Partners, P.A., and Suzan Jon Jacobs, for appellees.


Before LAGOA, SALTER, and LOGUE, JJ.

LOGUE, J.

CDC Builders, Inc. ("the Contractor") appeals a final summary judgment of foreclosure which terminated its construction liens for luxury homes it built on two developments. The Contractor opposed the foreclosure action on the basis that the newly-formed entity that filed the foreclosure action was created (1) by the same investors that controlled the Developers of the project and (2) for the primary purpose of acquiring the first mortgage from the Developers' lender, foreclosing the mortgage, and thereby eliminating the Contractor's construction liens. We reverse because there is sufficient evidence in the record to establish an issue of fact regarding whether these allegations are true, in which event, the foreclosure would not eliminate the Contractor's construction liens.

## FACTS AND PROCEDURAL BACKGROUND

This case involves a somewhat complicated network of interrelated land development companies managed by Brian McBride. McBride is an attorney who has worked for his family's Cleveland, Ohio-based taxicab company for over twenty-five years. He is the manager of McBride Family Properties, LLC, a real estate investment firm owned by him and his family members. He has developed properties in Florida since 1993.

In February 2006, McBride Family Properties deeded vacant properties to Riviera Biltmore, LLC and Riviera Sevilla, LLC ("the Developers"), companies formed by McBride and others for the sole purpose of developing the properties.

2

Through the buyout of one of the original investors, at all times relevant to this matter, McBride Family Properties controlled and largely owned the Developers. To fund the project, the Developers obtained construction loans from SunTrust Bank—at the same branch location where McBride had been a long-standing customer. The loan was personally guaranteed by McBride, McBride Family Properties, and the individual who was later bought out by McBride Family Properties.

Shortly after their formation, the Developers hired the Contractor to construct twenty-five luxury homes on the properties. At times, the Developers did not have sufficient funds to meet their construction expenses. The Contractor was consequently paid by checks drawn on companies managed by McBride. The Contractor completed the homes and obtained certificates of completion from the governing municipality. When the Developers failed to pay for the last eight homes constructed, the Contractor recorded two statutory construction liens. Ultimately, the Contractor filed a lawsuit against the Developers, including counts to foreclosure its liens.

When the SunTrust loans matured, the Developers could not pay off the loans due to a lack of home sales. McBride sought and obtained several loan extensions, with SunTrust referring to the extensions as the "McBride renewals" in

3

several email correspondences during loan extension negotiations. The closing costs for the loan renewals were paid by McBride Family Properties.

As a condition to granting the renewals, SunTrust required "curtailment" payments that reduced its exposure on the loan. McBride authorized SunTrust to debit these payments from accounts at the bank of other companies he owned or controlled. Moreover, he specifically directed SunTrust that these payments should not be treated as reductions in the principal amount of the loan, which would have reduced the interest on the loans. Instead, he insisted the payments be treated as junior liens against the property. He took this unusual step, the SunTrust officials noted, in order to limit the equity available to satisfy the Contractor's construction liens. An internal SunTrust document titled "Real Estate Finance Risk Analysis" reports:

> Unable to reason with the [Contractor], this has now escalated into a lawsuit and the [Contractor] recently placed liens on all the finished homes located in the Sevilla section. That lien has been bonded-off in the approximate amount of $350,000 by Brian McBride. While the Borrower does not believe the [Contractor] has a case, they are taking steps to strengthen their position in the unlikely event the [Contractor] should prevail. One of these steps was to approach the Bank and request that any curtailments/principal reductions made to the loan that come directly from Brian McBride be given a junior secured position subordinate to SunTrust's senior lien Position. Their thought is that any principal reduction creates more equity exposure to [the Contractor's] lawsuit.

These statements by SunTrust officials support an inference that McBride was taking affirmative steps for the express purpose of defeating the Contractor's construction liens in the event that a court upheld the liens.

This background cannot be ignored when considering the circumstances surrounding the creation of Biltmore-Sevilla Debt Investors, LLC ("BSDI"), which was the entity that purchased the mortgages at issue. On April 29, 2010, McBride formed BSDI. McBride is the manager of BSDI. The members of BSDI were limited liability companies owned by McBride and his family.[1] McBride actually signed BSDI's operating agreement five separate times in five separate capacities, as manager of BSDI and as manager of each of its members. BSDI was operated out of the same Cleveland office as the other McBride entities.

Although SunTrust had not actively marketed the loans for sale and was apparently willing to renew the loans to provide the Developers with more time to make payments, McBride did not seek further extensions of the loans. Instead, BSDI borrowed money from the Royal Bank of Canada for the purpose of purchasing the loans from SunTrust at full face value. BSDI was able to obtain this loan although it had no assets. When questioned, McBride could not recall where the collateral or guarantees for the Royal Bank loan originated. He could not recall whether he had guaranteed the $10,000,000 loan.

---

[1] Brian A. McBride Investments, LLC; MBK Investments, LLC; McBride Family Investments, LLC; and Biltmore-Sevilla Investments, LLC.

In June 2010, BSDI used the loan from Royal Bank to pay off the SunTrust construction loans. SunTrust duly executed two loan assignments to BSDI. Although BSDI purchased the loans, SunTrust sent the payoff information to McBride as the president of McBride Family Properties. In SunTrust's internal records, the officer who had negotiated with McBride characterized the transaction in this manner: "This loan was repaid by the borrower buying our documents."

Around the time of BSDI's formation, the trial court, in the Contractor's action against the Developers, granted the Developers' motion for partial summary judgment and discharged the Contractor's construction liens. The Contractor appealed. In December 2010, this court reversed, holding that the Contractor's liens should not have been discharged. CDC Builders, Inc. v. Riviera Almeria, LLC, 51 So. 3d 510, 511 (Fla. 3d DCA 2010). Less than a week after this court issued its mandate in CDC Builders, BSDI filed the underlying action to foreclose its construction loans against the Developers. Along with the Developers, BSDI named the Contractor as a defendant. The Developers answered the complaint but did not offer any defense to the foreclosure. In contrast, the Contractor answered the complaint, counterclaimed against BSDI and McBride, cross-claimed against the Developers, raised affirmative defenses, and actively challenged BSDI's attempt to eliminate the construction liens.

The trial court ultimately entered a final summary judgment of foreclosure in favor of BSDI, which found that the Contractor's affirmative defenses and counterclaims were "legally insufficient and/or factually disproven by the undisputed record evidence." This appeal followed.

## ANALYSIS

The law does not permit a person to borrow money from a bank, give the bank a mortgage, incur additional liens and junior mortgages on the property, purchase the mortgage back from the bank, and then foreclose on the mortgage for the primary purpose of eliminating the additional liens and junior mortgages.

The Third Restatement of Property explains this rule of law as follows:

> When a payment in full is made by a person who is primarily responsible for the obligation, but the payor and payee agree not to extinguish the mortgage, the payor might attempt to claim ownership of the mortgage, either under the principle of subrogation or by taking a formal assignment of the mortgage from the mortgagee. The payor might then purport to foreclose the mortgage against the holder of some junior lien or other interest subordinate to the mortgage. However, subrogation is inapplicable to this situation, since one who is primarily responsible for an obligation cannot have subrogation upon paying it; Indeed, even a formal assignment of the mortgage to the payor would confer no power on the payor to foreclose the mortgage against junior interests, since doing so would unjustly enrich the payor.

Restatement (Third) of Property (Mortgages) § 6.4 cmt. e (1997) (internal citations omitted).

This rule has been part of Florida law since at least 1932. In fact, Florida has expressly recognized that this rule holds true even if the borrower obtains and forecloses the mortgage through a corporation that it controls. In Clermont-Minneola Country Club v. Loblaw, 143 So. 129, 130 (Fla. 1932), for example, a mortgagor hired a contractor to pave parts of her property. The contractor's work resulted in a lien on the property. Id. The mortgagor then paid the mortgagee to assign the mortgage to a corporation in which she and her husband were "practically the only shareholders" in order to foreclose and eliminate the contractor's lien. Id. at 132. In holding that the contractor's lien continued to attach to the property, the Florida Supreme Court observed:

> It is a fundamental principle of law that a person will not be permitted to do indirectly what he is not permitted to do directly. Under this principle, the property would not be permitted to escape the legal effect of the mortgage "assignment," for which [the borrower] admits having furnished the funds, by merely having it assigned to a corporation which was apparently organized by her for the purpose of taking title as it does not so much depend upon the form of the transaction actually used to hinder, delay, or defraud creditors, as it does upon the relation existing between the party advancing the money, the party taking title, and the parties affected by the transaction.

Id. at 134.

In so holding, the Court explained that "equity will not apply the principle of subrogation, where to do so would deprive a party of a legal right." Id. at 133 (citation omitted). Although this rule is generally accepted, caselaw reflects either

disagreement or confusion regarding the doctrinal basis for the rule.[2] It is not necessary to this appeal to resolve that dispute. For our purposes, it is sufficient to recognize that the rule is part of Florida law. In applying the rule, it stands to reason that what investors cannot do indirectly through a single company, investors cannot do indirectly thought a network of companies.

Turning to our case and viewing the record in the light most favorable to the Contractor, genuine issues of material fact exist precluding summary judgment against the Contractor.[3] First, a jury could find that McBride controlled the

---

[2] The Florida Supreme Court treats the rule as stemming from an equitable limitation on subrogation. See Clermont-Minneola, 143 So. at 134; Fla. Land Holding Corp. v. Lee, 159 So. 7, 8 (1935) (holding the purchase of a tax certificate by the taxpayer "in equity will be regarded as redemption where it is part of a transaction by which one whose duty it was to pay the taxes attempts thereby to defeat a lien on the property by letting it sell for taxes and then buying it in at the tax sale in an effort to defeat the rights of lienors"). Two Second District opinions discussed later in this opinion treat the rule as stemming from merger and subrogation. See MB Financial Bank, N.A. v. Paragon Mortg. Holdings, LLC, 89 So. 3d 917 (Fla. 2d DCA 2012); C.T.W. Co., Inc. v. Rivergrove Apartments, Inc., 582 So. 2d 18 (Fla. 2d DCA 1991). A New York court treated the rule as stemming from principles of merger and fraud. See Cambridge Factors, Inc. v. Thompson, 626 N.Y.S.2d 259 (N.Y. App. Div. 1995) (upholding a lower court's finding of a merger where "the appellant, through the use of aliases and alter egos, held title to the property under one name and held the first mortgage in the name of a sham corporation with the apparent purpose of perpetrating a fraud upon the plaintiff, the holder of a second mortgage"). The Restatement expressly eschews merger in this area and treats the rule, similar to the Florida Supreme Court, as an equitable limitation on subrogation. Restatement (Third) of Property (Mortgages) § 8.5 cmt. d ("As it does in other contexts, this section rejects the application of a merger analysis in this situation. Rather, subrogation principles are applicable.").

[3] We are reviewing a final summary judgment, which is subject to the de novo standard. Fla. Bar v. Greene, 926 So. 2d 1195, 1200 (Fla. 2006). "Summary

9

Developers. He was the manager and sole member of McBride Family Properties, which had an almost 90% membership interest in the Developers at the time BSDI purchased the SunTrust loans. At times, the Contractor was paid on checks drawn on other entities linked to McBride. He also solely negotiated and arranged the loan extensions with SunTrust to such an extent that SunTrust referred to the loan extensions as the "McBride renewal." This was due, in part, to his actions in paying the closing costs for the loan renewals through McBride Family Properties and authorizing SunTrust to debit the curtailment payments from an account at the bank in the name of his broadcasting company.

At the same time, a jury could also find that McBride controlled BSDI. He managed the company, signed the operating agreement on behalf of all of its members, and directed it to purchase the SunTrust loans and then foreclose on the same. It is unclear, however, who personally guaranteed the Royal Bank loan, BSDI's only capital, which was obtained to purchase the assignment of the SunTrust loans. At a deposition, McBride, BSDI's manager, could not recall who personally guaranteed the multimillion dollar loan, including whether he

judgment is designed to test the sufficiency of the evidence to determine if there is sufficient evidence at issue to justify a trial or formal hearing on the issues raised in the pleadings . . . ." Id. It is proper only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fla. R. Civ. P. 1.510(c). "On a motion for summary judgment, the court must read the record in the light most favorable to the non-moving party." Deakter v. Menendez, 830 So. 2d 124, 127 (Fla. 3d DCA 2002).

10

personally guaranteed the loan. A jury may not believe McBride's lapse of memory on this point, and could, along with the other evidence, draw an inference on this point as well.

The timing of crucial events supports a fair inference that BSDI's creation, purchase of the SunTrust loans, and subsequent foreclosure action were primarily for the improper purpose of defeating the Contractor's attempt to collect on its liens. BSDI was not formed until around the time the Contractor was moving for summary judgment in its suit to foreclose on its construction liens. Even after BSDI acquired the mortgage, BSDI did not commence its foreclosure until shortly after this court entered an opinion in favor of the Contractor. This timing implies that BSDI's foreclosure of the mortgage was undertaken to block the Contractor's efforts to collect the construction liens.

The statements of SunTrust representatives also support an inference that BSDI was created by McBride for the improper purpose of defeating the Contractor's liens. This suggestion is directly bolstered by SunTrust's internal documents which report that McBride was taking "steps to strengthen [the Developers'] position in the . . . event the [Contractor] should prevail" in its suit against the Developers. In fact, a SunTrust employee familiar with the BSDI's purchase of the loans summed up the transaction as follows: "This loan was repaid by the borrower buying our documents." This comment reflects the Contractor's

11

allegation that BSDI was not acting as a disinterested third party but as an agent of the Developers and McBride.

Moreover, McBride could not provide a legitimate reason why he formed BSDI and why BSDI purchased the mortgage. Directly asked at a deposition to explain why BSDI obtained the Royal Bank loan in order to purchase the SunTrust loans, McBride offered only the most conclusory response, without providing any specific alternative explanation that would rebut the obvious purpose of eliminating the construction liens. Nor could he explain why the Developers declined to seek to extend the payment period for the SunTrust loans, where SunTrust was willing to extend the payment period for the loans as it had in the past. This absence of a legitimate alternative reason supports an inference that the actual primary purpose was to defeat the Contractor's liens.

Not only does this evidence create genuine issues of material fact, but the record also reflects that discovery remains to be completed. The Contractor, for example, unsuccessfully sought documents relevant to these issues, including the operating agreements of each member of BSDI, the written agreement regarding McBride Family Properties' buyout of the investor in the Developers whose interest was purchased, and documentation reflecting the source of the collateral or guarantees of the Royal Bank loan that was used to purchase the assignment.

12

Without discovery on these matters, entry of final summary judgment against the Contractor was premature.

The cases cited by the Appellees, MB Financial Bank, N.A. v. Paragon Mortgage Holdings, LLC, 89 So. 3d 917 (Fla. 2d DCA 2012) and C.T.W. Co., Inc. v. Rivergrove Apartments, Inc., 582 So. 2d 18 (Fla. 2d DCA 1991), do not mandate a contrary result. In both cases, a group of investors purchased a property through a loan and granted the lender a mortgage. When additional money was needed for the development of the property, only some of the original investors were willing to provide more capital. The investors willing to contribute additional money formed business entities that ultimately paid off the lenders and acquired the mortgages. MB Financial Bank, 89 So. 3d at 919; C.T.W., 582 So. 2d at 19. The courts in both cases held that there was no merger of the owner's interest and the lender's interest that would prevent an assignment of the mortgages to the newly created entities that paid off the mortgages. MB Financial Bank, 89 So. 3d at 921; C.T.W., 582 So. 2d at 19-20. Thus, in one case the holders of a junior mortgage were held to have an interest inferior to the first mortgage. MB Financial Bank, 89 So. 3d at 921. In the other case, the holders of a junior mortgage lost their mortgage when the first mortgage was foreclosed. C.T.W., 582 So. 2d at 19.

Significantly, in both of these cases, the investors in the new entities that acquired the mortgages were different from the investors in the original project.

13

The new entities consisted only of the investors willing to risk more money while the entities that owned the original projects consisted of the original investors, which included those willing and those unwilling to risk more capital. The entities were not identical and their interests were not identical. In our case, in contrast, a jury could find that both BSDI and the Developers were controlled by McBride and largely owned by McBride and his family.

Moreover, the new entities in MB Financial and C.T.W were formed in order to purchase the mortgages for the same transparent and legitimate reason. In both cases, the purpose for creating the new entities was to provide a vehicle to infuse new capital into the project because some of the original investors balked at contributing more money. The Appellees in our case have not offered any such legitimate reason. To the contrary, as discussed above, the record in this case raises genuine issues of material fact concerning whether McBride orchestrated the purchase of the mortgage for the primary purpose of thwarting the Contractor's collection of the construction liens.

The Appellees maintain that final summary judgment in their favor was proper because the Contractor "bargained for" a lien position subordinate to the mortgage. It is certainly true that, under the Contractor's bargain, the Contractor's construction liens would be wiped out if the Bank foreclosed on the mortgage (and if, as apparently was the case here, there was no equity in the property in excess of

14

the mortgage). Similarly, under the Contractor's bargain, the Contractor's liens would be wiped out if a third party obtained the mortgage and foreclosed. But the Contractor's "bargain" provided that it would be paid before the Developers were paid. The Contractor's bargain thus aligned the interest of the Developers with the interest of the Contractor, because the Developers could realize no profit until after the Contractor was paid. The Contractor's bargain did not acquiesce to a maneuver whereby the investors of the Developers could elevate their interest over the Contractor's construction liens. If accepted, the Appellees' argument would deliver to the Developers' investors a windfall in the form of the value of the Contractor's labor, equipment, and materials that went into the luxury homes that improved the investors' property.

In closing, investors cannot grant mortgages, contract for the improvement of the property mortgaged, and then use a network of companies to purchase and foreclose the mortgage for the primary purpose of extinguishing the construction liens that increased the value of the property. To hold otherwise would undermine the long-standing principle recognized by our Supreme Court in Clermont-Minneola —persons cannot do indirectly what they are not permitted to do directly.

15

Accordingly, we reverse the parts of the final judgment that adjudicate the rights of the Contractor and remand for further proceedings regarding the Contractor's counterclaim and affirmative defenses.